## GAYLE v. MISSOURI CAR AND FOUNDRY COMPANY, Appellant.

### Division Two, November 17, 1903.

1. **Master and Servant or Independent Contractor: TEST.** An independent contractor is one who undertakes to do a specific piece of work for another without submitting himself to such other's control in the details of the work save as to the result of the work. So that one who contracts to do a specific piece of work, furnishing his own assistants and executing the work either entirely according to his own ideas, or in accordance with a plan previously given him by the person for whom the work is done, without being subject to the orders of the latter in respect to the details of the work, is a contractor and not a servant. And an express contract to pay by the job is always strong evidence that the relation of master and servant does not exist.

2. ———: ———: **INSPECTION.** The mere right on the part of the employer to inspect the work as it progresses and to require it to meet the approval of the employer, does not make the contractor a servant.

3. ———: **WHEN QUESTION FOR JURY.** When the facts are undisputed the court may declare as a matter of law whether one is an independent contractor or merely a servant; but where the facts are disputed the court should leave it to the jury, under proper instructions, to say whether he was the one or the other.

4. ———: ———: **RIGHT TO DISCHARGE.** Where there is a plain contradiction in the evidence as to the right of the employer under their contract to discharge the employee at any time, the court should leave it to the jury to find whether or not the employee was a mere servant or an independent contractor.

5. ———: **FELLOW-SERVANT.** If an employee is an independent contractor, he is not a fellow-servant with the other employees of defendant who operated the defendant's machinery which caused his injury.

6. **Negligence:** GENERAL AND SPECIAL ALLEGATIONS. Where there is a general allegation of negligence in the petition, followed by an enumeration of specific acts, a proof of any one of the specific acts is sufficient.

7. ———: DAMAGES: INSTRUCTION: ASSUMPTION OF FACT. Where the jury in the instruction as to damages are required to assess plaintiff's damages at such sum as they may "believe from the evidence" will compensate him for his injuries "caused" by the negligence of defendant, there is no assumption of the fact that he was injured by the accident.

8. **General Objections Insufficient.** An objection that a question is "irrelevant and incompetent" amounts, on appeal, to no objection at all.

9. **Waiver:** SUBMITTING ISSUES TO JURY. Appellant is bound by the line of conduct he adopted at the trial. He can not play fast and loose. If by his own instructions he submitted to the jury the questions which he says should not have been submitted to them, he can not on appeal be heard to say that they were questions of law for the determination of the court alone.

Appeal from St. Louis County Circuit Court.—*Hon. John W. Booth,* Judge.

AFFIRMED.

*Seddon & Blair* and *Robt. A. Holland, Jr.,* for appellant.

(1) The court erred in refusing to give the instruction in the nature of a demurrer to the evidence offered by defendant at the close of plaintiff's evidence in chief, and at the close of all the evidence, for the following reasons: (a) Because the plaintiff in this case brought his suit on the theory that he was working for the defendant as an independent contractor, and not as the servant of defendant. The evidence, however, shows that he was not an independent contractor, but a servant of defendant. It is well-settled law in this State that the plaintiff can only recover upon the allegations of his petition, and this suit having been brought on the theory that the plaintiff was an independent con-

tractor, he cannot be allowed to recover on the theory that he was only a servant. Chitty v. Railroad, 148 Mo. 64; Yarnell v. Railroad, 113 Mo. 376; Melvin v. Railroad, 89 Mo. 106; McManamee v. Railroad, 135 Mo. 440; Waldheir v. Railroad, 71 Mo. 514; McCarty v. Hotel Co., 144 Mo. 397. (b) Because there were only three allegations of negligence in plaintiff's petition, and there was no evidence whatever to support any of said allegations. There was nothing, therefore, to submit to the jury. The court should, therefore, have granted said peremptory instruction. Cases cited, supra. (2) The court erred in giving instruction No. 1 offered by plaintiff. Said instruction incorrectly states the law as to the circumstances when a person is an independent contractor and when he is a servant. Said instruction is also erroneous because the evidence of the plaintiff himself shows that he was a servant of the defendant. The plaintiff is conclusively bound by his own testimony, and therefore it was erroneous to instruct the jury that the plaintiff, under the circumstances, would be an independent contractor, because plaintiff was conclusively bound by his own testimony to the effect that he was an ordinary employee of the defendant. State v. Brooks, 99 Mo. 137; Feary v. Railroad, 162 Mo. 106; Erwin v. Railroad, 68 S. W. 91; Holmes v. Leading, 69 S. W. 32. (3) The court erred in giving instruction No. 2 asked by plaintiff. Said instruction is erroneous, because it is in part predicated upon facts in regard to which there is absolutely no evidence. It refers to a question as to whether the ropes on the transfer table had become entangled on the drums and spools, and as to whether the men on the transfer table were at work disentangling said ropes while the transfer table was in motion. There was absolutely no evidence in the case that the said two men were so at work. On the contrary, the testimony offered by the plaintiff himself shows that while one of the men was so engaged the other was not. The

court, therefore, erred in giving said instruction, as it is well settled in this State that it is error for the court to give an instruction in regard to matters in reference to which there is no evidence. Stone v. Hunt, 114 Mo. 66; State v. Hope, 102 Mo. 410; Evans v. Interstate Company, 106 Mo. 594; State v. Brown, 145 Mo. 680; Wilkerson v. Eilers, 114 Mo. 245; Yarnell v. Railroad, 113 Mo. 570; Waldheir v. Railroad, 89 Mo. 106; Woods v. Campbell, 110 Mo. 572. (4) The court erred in refusing to give instruction D asked by defendant. Said instruction reads as follows: "D. The court instructs the jury that on the occasion in question the plaintiff was working as a servant of plaintiff and was not an independent contractor." The said instruction should have been given by the court because the evidence introduced by plaintiff, as well as that introduced by defendant, shows that the plaintiff was a servant of defendant and not an independent contractor. (5) The court erred in refusing to give instruction No. 1 asked by defendant. Said instruction should have been given because it correctly states the law. Under the circumstances and conditions mentioned in said instruction, the plaintiff would not be an independent contractor, but an ordinary servant, and if an ordinary servant he would not be entitled to recover, because the suit was brought on the theory that the plaintiff was an independent contractor. Chitty v. Railroad, 148 Mo. 64; Yarnell v. Railroad, 113 Mo. 376; Melvin v. Railroad, 89 Mo. 106; McManamee v. Railroad, 135 Mo. 440; Waldheir v. Railroad, 71 Mo. 514; McCarty v. Hotel Company, 144 Mo. 397. (6) The court erred in refusing instruction 2, asked by defendant. Said instruction, in the form in which it was asked by defendant, correctly expressed the law, and should have been given. It said, in substance, that if the injury sustained by plaintiff was wholly due to negligence on the part of either Horst or Whitneber, the men in charge of the transfer table, the plaintiff was not entitled to

recover; for plaintiff, in his petition, did not seek to recover on the ground of any negligence on the part of either said Horst or Whitneber, but on several other charges of negligence. If, therefore, the injuries were due wholly to negligence, on the part of said men, a negligence not pleaded by the plaintiff, then and in that case the plaintiff would not be entitled to recover. Chitty v. Railroad, 148 Mo. 64; McManamee v. Railroad, 135 Mo. 440; Waldheir v. Railroad, 71 Mo. 514; McCarty v. Hotel Company, 144 Mo. 397. The court erred in modifying said instruction and giving it as modified. Said instruction was also erroneous because it was not right, under the circumstances, for the court to submit to the jury the question as to whether the plaintiff was a fellow-servant of Horst and Whitneber, because the evidence of the plaintiff himself showed that he was such a fellow-servant, and plaintiff was bound by his own testimony. State v. Brooks, 99 Mo. 137; Feary v. Railroad, 162 Mo. 106; Erwin v. Railroad, 68 S. W. 91; Holmes v. Leading, 69 S. W. 323.

*Daniel Dillon* and *Geo. E. Egger* for respondent.

The refusal of the peremptory instruction to find for defendant is said to be error for two reasons; first, because plaintiff brought his suit on the theory that he was an independent contractor, and the evidence showed he was a servant of defendant; and, second, because there was no evidence to support any of the allegations of negligence contained in the petition. The petition makes no mention of independent contractor. It alleges that plaintiff, in conjunction with certain other persons, contracted and agreed with defendant to frame, in the sheds of defendant, cars of a certain kind which defendant was then building, and that defendant agreed and promised to pay plaintiff and his associates $3 a car for every car framed by them. We claim, however, that the evidence shows that plaintiff

was what is technically called an "independent contractor." There is no dispute that plaintiff agreed with defendant to frame the cars for $3 a car. The testimony of defendant admits this much. The testimony for plaintiff further shows that it required a gang of four men to frame these cars, and that plaintiff employed the three men who worked with him and made up the gang. Some of these men had been working for defendant, at other work, before plaintiff engaged them, and some of them had never worked for defendant, but went to work in the shops of defendant for the first time on being hired by plaintiff to work as one of his gang. Plaintiff agreed with these men that if they would do as much work as he, they would divide equally the $3 which was received for framing each car. Plaintiff had direction and control of the work done by this gang and had control of the gang. They worked when they pleased and quit when they pleased, and sat down when they pleased. The men in this gang paid no attention to any one but Gayle; he hired them and they knew no foreman over him. There were inspectors at the works to see that proper timber was used, and to see when the cars were turned out, and that they were properly done. But defendant exercised no control as to how the work should be done, or the manner in which the men went about it. The supervision exercised by defendant was only as to the result of the work of plaintiff, to see that the car when built was according to requirements. This did not take away from plaintiff the position of an independent contractor. Barry v. St. Louis, 17 Mo. 121; Fink v. Mo. Fur. Co., 82 Mo. 283; Wiese v. Remme, 140 Mo. 298; Long v. Moon, 107 Mo. 339. Besides, defendant itself, by its course at the trial, conceded that it was a question for the jury under the evidence whether plaintiff was an independent contractor or not. By its instruction 1 defendant asked the court to submit this issue to the jury. This instruction, with a change not at all affecting this point, was

given to the jury. "When appellant itself has asked
the judgment of the jury upon a given issue, it will not
afterward be heard to challenge the verdict on the
ground that the issue was improperly submitted to the
jury." Berkson v. Railroad, 144 Mo. 220; Franken-
thal & Bro. v. Ins. Co., 76 Mo. App. 19. In suing 'a de-
fendant for damages caused by the negligence of his
servant, it is not only permissible but proper pleading
to allege in the petition that defendant did the acts al-
leged to be negligent, and it is not necessary to allege
that he did these acts by and through his servants. And
an allegation specifying the act and averring that it
was done negligently and carelessly is sufficient, espec-
ially after verdict, and when defendant has gone to trial
without objecting to the generality of the charge. Mack
v. Railroad, 77 Mo. 232; Schneider v. Railroad, 75 Mo.
295; Benham v. Taylor, 66 Mo. App. 308.

GANTT, P. J.—This is an appeal from a judgment
of the circuit court of St. Louis county for five thousand
dollars. The action was for damages caused by per-
sonal injuries alleged to have been sustained by plain-
tiff through the negligence of defendant in negligently
running what was charged to be a transfer car, in its
car works, suddenly and violently against a piece of
timber, the end of which was projecting over its track,
and which piece of timber plaintiff and others were
bringing across said track to the shed in which plain-
tiff and his gang of workmen were framing box cars
under a contract with defendant of three dollars for
each car framed.

The answer was a general denial, a plea of con-
tributory negligence, and a plea that if the injuries
were in anywise caused by the negligence of defend-
ant's employees said employees were the fellow-serv-
ants of plaintiff and plaintiff assumed the risk of any
negligence on their part.

Vol 177 mo—28

The reply denied all new matter alleged in the answer.

The petition states in substance that the defendant is a corporation organized under the laws of this State and engaged in manufacturing cars in the city of St. Louis and plaintiff is and was at the time therein mentioned a carpenter and contractor, and in the month of July, 1898, he in conjunction with certain other persons contracted and agreed with defendant to frame and do the work in framing in the sheds and premises of defendant in said city, cars of a certain kind which defendant was then building, and defendant agreed and promised to pay plaintiff and his associates three dollars for every one of said cars framed by them.

The works or premises of defendant in said city in which said cars were being built, constituted, in part, several large sheds between which ran a transfer track, on which was run by defendant by means of one engine, a transfer car or platform which was used to transfer cars from one of said sheds to another. The west one of said sheds on the south side of said transfer track previous to August 22, 1898, was the one in which said cars were framed by plaintiff and his associates, and in bringing the timbers used in framing said cars plaintiff and his associates did not have to bring or carry said timbers across the said transfer track.

On said 22d day of August, 1898, defendant directed plaintiff and his associates to move from said west shed into the east shed on the south side of said transfer track and to frame said cars in said east shed, and thereupon plaintiff and his associates began to frame cars in said east shed. The timbers to be used in framing said cars were required to be brought into said east shed by carrying them across said transfer track, a fact well known to defendant and its superintendent and foreman.

And on the 23d day of August, 1898, plaintiff and his said associates were engaged in bringing into said

east shed a long and heavy timber to be used in framing said cars, and when one end of said timber was in said shed, and the other or hind end still projected over and across a rail of said transfer track, and while plaintiff and his associates were engaged in trying to bring the whole of said timber into said shed, the portion of said timber which projected over and across said rail of said transfer track, was suddenly and violently struck and pushed by said transfer car or platform, and a railroad car which stood on said platform, and said timber was shoved and pushed with great force against a post, causing the other or forward end of said timber, near which plaintiff was, to strike plaintiff and to force and press him with great force and violence against another timber or post, thereby crushing, mangling and injuring plaintiff, internally and externally, and crippling, injuring and disabling him for life.

And plaintiff says that when plaintiff and his associates began to frame cars in said east shed as aforesaid, or at any time thereafter, defendant did not notify its servants and employees engaged in running said transfer car and the engine that propelled the same, that plaintiff and his associates were working in said shed, and that they would have to bring timbers into said shed over and across the rails of said transfer tracks, and to be on the lookout or watch so as not to injure them while they were bringing said timbers into said east shed. And it was the duty of defendant, when operating and running said transfer car over and along said transfer track, to have some competent person so placed that he could see any obstacles or obstruction that might be on or over said transfer track and give notice thereof in time to prevent a collision or injury. And at the time plaintiff was hurt and injured as aforesaid, defendant had no person so placed that he could see obstacles on or over said transfer track. And the employees and servants of defendant who were on said transfer car and engine propelling same at said time,

by direction of defendant, were so engaged and occupied in other work that they could not and did not see said timber extending over and across the rail of said transfer track. And plaintiff says that by the exercise of ordinary care and prudence defendant should have avoided striking the end of said timber as aforesaid and injuring plaintiff as aforesaid.

And plaintiff says he was injured as aforesaid by the carelessness and negligence of defendant in causing said transfer car or platform, and a railroad car on same, to strike and push said end of said timber projecting over and across the rail of said transfer track as aforesaid. And plaintiff further says that he was injured as aforesaid by the carelessness and negligence of defendant in not notifying its servants and employees on and operating said transfer car or platform and engine propelling same that plaintiff and his associates were working in said east shed and would have to bring timbers into said shed over and across said transfer track, and to be on the lookout for them crossing said track with said timbers, and by the carelessness and negligence of defendant in not having some person so placed that he could see obstacles on or over said track and give notice in time to avoid collision and injury, and by the carelessness and negligence of defendant in having its servants and employees who were on said transfer car or platform and engine propelling same at time plaintiff was injured as aforesaid so occupied and engaged at other work that they could not, and did not, see the said end of said timber projecting over and across the rail of said transfer track.

And plaintiff further says that at the time of and before he was hurt and injured as aforesaid, he was a strong, healthy man and a good mechanic and steadily employed, and regularly earned good wages, viz., five dollars a day. And plaintiff says that as the direct result of the said injuries received by him as aforesaid he was very sick and confined to his house and bed for

a long time, viz., four months, and suffered great and excruciating pain both bodily and mentally, and plaintiff has paid out for medical services and for medicines and nursing, rendered necessary by said injuries, a large sum, viz., $500. And plaintiff has not yet recovered from said injuries so as to be able to do any work or labor, and he has lost his wages and earnings ever since said injuries, to-wit, August 23, 1898, viz., $700. And plaintiff as the direct result of said injuries is injured and crippled for life, and will never be able again to do hard work, or labor or work at his trade, or do' any work or labor, and that he will hereafter, as long as he lives, require medical attention and medicines and nursing in consequence of said injuries received as aforesaid, and he will as long as he lives suffer great pain, bodily and mentally, as the direct result of said injury. And plaintiff says that by reason and in consequence of the injuries received by him as aforesaid he has been damaged in the sum of twenty thousand dollars ($20,000) for which sum he asks judgment.

The cause has been twice tried, resulting each time in a verdict for $5,000.

The facts are not complicated. According to plaintiff's evidence Mr. Dalton was the superintendent of the defendant's car works. Plaintiff is a carpenter and contractor, residing in St. Louis.

Plaintiff and his son went to work for defendant about July 20, 1898, and did "lining up" and a few days later Mr. Dalton gave him a track to frame cars on, known as track No. 1, in the main shed. After working there about 10 days, as plaintiff and his gang did not work on a certain Sunday, the defendant put other men to work on this track. The agreement between plaintiff and the superintendent, Mr. Dalton, was that plaintiff should receive three dollars for every car he framed. Mr. Dalton told him he could not get together a gang to help him frame. It required

four men to do this work, but that plaintiff could get the gang and he would give him a track to frame the cars on. Thereupon plaintiff looked around and got the other three men together and went to work on the track designated by Mr. Dalton. Billy Hoch and Ben Hockenbough were two of these men that worked with plaintiff. Under this arrangement they went to work some time in August, 1898, and had steady employment until the time plaintiff was hurt. The plaintiff's gang were shown where to get the necessary timbers. In order to get them into the shed where the framing was done it was necessary to take them across the transfer track, or what is denominated "the pit of the transfer table" or car. The tracks of this pit run east and west and the sheds were on the north and south of it. On this transfer table or car there was a regular railroad track, so that a car could be pushed from either shed upon this track on the transfer table, and then the table could be moved even with any other track in the sheds and the car pushed off of the transfer car on to the tracks in such shed. On the day of the accident to plaintiff he and his associates were carrying a heavy piece of timber across the transfer pit to the east shed on the south side and had gotten one end of it in the caboose shed and were pushing the timber on a car which they were engaged in framing, but the end toward the pit had not cleared the transfer track and when they had pushed the timber as far as they could and when it had gone a certain distance into the car, the end on which they were pushing raised up level with the floor of the car, but still projecting over the track; they then got into the car frame and shed and were pulling at it when the transfer table or car was run against it and the timber was suddenly thrown against plaintiff, forcing him against a post in the car and mashing him internally and breaking the timber before the transfer car was stopped.

As to the relationship of plaintiff to the company, whether servant or independent contractor, the following questions and answers of plaintiff indicate his understanding of his employment:

"Q. What was said as to the terms of agreement under which you were to frame cars there? A. I was to get $3 for every car I framed. Q. Well, what then? A. He told me I could go and get me a gang of men to help me frame; it required four men to do the work, and then he would give me that track to frame my cars on, and I looked around and got my gang and went to work on track number one, where he demanded me to work. Q. Was there anybody over you there to see that you worked, or could you work or quit as you saw fit? A. We could quit work at our pleasure. Q. Did anybody give you any directions? A. No, sir; of course when the shed was opened—we were working piece work and it was our duty to go to work as soon as the shed was opened. We were working for so much a car and of course it was to our interest to do as many cars as we possibly could. Q. How often were you paid? A. Paid monthly. Q. Paid according to the number of cars you framed? A. Yes, sir. Q. Each man in your gang received the same amount—equal proportion for the building of the cars? A. That is the agreement I made with the men. If they would do the work as much as I would do, we would work together and divide up the money equally. Q. And you went out and got this gang of men that worked with you, I understand? A. Yes, sir. Q. And in doing the work of that gang who had the direction and control of it? A. I had the direction of it; if there was anything wrong with the car, bolt or nut off, he would look at my number; it was the first; then he would send me to put this bolt on so that the inspector wouldn't see that there was anything wrong with the car. Q. In working together who took control of the four—was there anyone among you four that had control over the

other three—who had control of you four men? A. Well, I had control of them, certainly."

There is no reference in this connection to the testimony of Mr. Hoch, who testified as follows: "Q. Had you worked in the Missouri Car and Foundry Company there before Mr. Gayle got you to work in that gang? A. No, sir; he hired me to work there. Q. Who engaged you? A. Mr. Gayle. Q. You had not worked there before? A. Never put a foot in there before. Q. Had you ever spoken to Mr. Hunter before that? A. I walked in the place and asked Hunter for a job. Well, he says, you will have to go to the framers and see about that; and I happened to run across Mr. Gayle and he asked me if I ever framed before, and I says, 'No,' and he said, 'I will give you a trial and see if you are all right.' I continued to work for him until he was hurt."

The head foreman, Dalton, did not testify on part of defendant, but William Hunter, a subordinate foreman in the yards, testified for defendant that he was the foreman over that part of the yards and foreman of the framers. Had power to discharge any man that he was dissatisfied with in that part of the grounds. On cross-examination, he testified that if on any day there was no timber or material for Gayle's gang to work on, they lost that time. They got nothing except for the number of cars they framed. There was no contract that they should complete any particular number of cars a day. "Q. Did you ever tell him he had to frame five or four cars or any number of cars a day? No, sir." Never discharged Gayle or any of his men while Gayle was there before he was hurt. He hired them. He testified, however, that he told Gayle to get his gang. He further testified that the men constituting Gayle's gang were already in the employ of the company in other capacities, but admitted that Hoch had not worked for the company prior to Gayle's employment of him. Horst, who worked on the transfer

also said Hunter was foreman, but Horst did not work
on the framing work and knew nothing of Gayle's con-
tract.   Rockenburgh, another of Gayle's witnesses, tes-
tified that Hunter generally hired the framers but "of
course sometimes we made up a gang and he had noth-
ing to say what men we shall take.   We get them to suit
ourselves."

Defendant also offered in evidence a printed slip
in following form:

"No.......................

Missouri Car and Foundry Company.
Piece Work.
..................day of ...................  19..
Employe's No. .....................
                    ......................."

Plaintiff testified positively he never saw such a
slip during his work for the company.   Aldridge,
another of plaintiff's gang, testified — in response to
question by defendant's counsel, "Mr. Hunter was
foreman of that gang?"   "No, sir.   I paid no atten-
tion to anybody but Mr. Gayle in that gang; he was
the man that hired me."   Q.   "Mr. Gayle asked you to
come and work in the gang did he?"   A.   "Yes, sir."
Q.   "Who was Mr. Gayle's foreman?"   A.   "I don't
know that he had any foreman; if he did I didn't
know it."

On the part of defendant a deposition of plaintiff
was read in evidence, over which the following colloquy
occurred:   Q.   "What man directed your work?"   A.
"There were different men.   Mr. Dooley and any of
them."   Q.   "Mr. Dooley was superintendent?"   A.
"Yes, sir.   He is as liable to tell you as anybody else
but Hunter was foreman there.   I suppose Hunter was
the foreman under whom we worked.   Hunter was the
foreman under whom we most generally worked."

As to the cause of his injury plaintiff's evidence
tended to prove that when he and his gang were cross-

ing the transfer pit with the piece of timber to use in the car they were framing, the transfer car was standing about 80 feet west of them at a stand still; that the pit was about 300 feet long.

Horst testified that he was employed by defendant to work on the transfer platform in loading and unloading cars and moving them from one track to another as required for their completion. The transfer was operated by an engine in charge of Stephens, engineer, and by Horst and Whitneber. Whitneber was dead at the time of the trial, and Stephens, the engineer, was not called as a witness. He was still in defendant's employment at that time. Horst testified it was the duty of Whitneber and himself to adjust the cables on the platform car around the spools, and to watch out for obstructions on the track. On this occasion he didn't see any danger ahead and didn't pay any attention any more. Was engaged in fixing his rope and had not finished when the alarm was given. There was a box car in front of him on the transfer platform, and when the alarm was given he went around the end of it and saw they had struck the piece of timber and broke it. He could have seen plaintiff's gang if he had been looking at the time. He could see the whole length of the pit. Says he didn't know they were framing the caboose track, but there was nearly always work going on in that track. He testified that if the rope fouled it took a good deal of time to get it right. If not fouled, it took only a few seconds to put it round the iron spool. Sometimes it gets fouled every time you use it. It was his duty to watch out when not attending to his ropes.

Without recapitulating all the evidence it will suffice to say that the evidence abundantly tended to show that but for the failure of Horst and Whitneber to keep a proper lookout and signal the engineer, the transfer platform would not have been run against the projecting timber which plaintiff and his associates

were handling at the time and the plaintiff would not have been hurt. Indeed we understand the contention of counsel for defendant to be that it was the duty of these two men who worked on the transfer in loading and unloading cars to keep watch, and that they were negligent in not doing so, and plaintiff's injuries resulted from their negligence, but that they were fellow-servants of plaintiff and consequently he can not recover. As to plaintiff's injuries, the evidence shows he was crushed between the pieces of heavy timber and car post and was only relieved by the breaking of the timber. He was mashed until he was insensible. He was taken to a hospital where he stayed for a week and then went home.

About sixty days after he was hurt an abscess formed in him and every month since then it has returned. Since the first abscess he has never had a passage of his bowels without the use of a syringe. Has never been able to do any work of consequence since. Some days he would do a little light hauling, and then would be compelled to remain in bed all day. Before his injury he was a strong healthy man and had never been sick. He had earned $135 a month in the McDonald Iron Works just prior to going to work for defendant. He and his gang built from five to six cars a day and the proceeds were divided equally between them. Drs. Curtis and Ward treated him for his injuries. He has practically been in the care of the physicians ever since he was hurt. Dr. Edgar T. Ward testified as follows:

"Edgar T. Ward, being duly sworn, testified as follows on behalf of plaintiff: Is a physician by profession and has been one six or seven years. Is acquainted with plaintiff, having met him in August, 1898. On the 23d day of August, 1898, a friend of witness, Dr. Curtis, was taken sick and telephoned witness to come down to his office; witness went down, and the next day or second day afterwards Mr. Gayle came to

the office and witness and Dr. Curtis examined him together. After that witness saw plaintiff a great many times at his residence, and also at Dr. Curtis's office. When witness first examined plaintiff he showed symptoms of internal injuries and symptoms of suffering great pain. He could not stand any pressure on his abdomen for the purpose of making an examination, and merely a palliative treatment was used until plaintiff could stand the pressure necessary to make a diagnosis. Subsequently witness found that plaintiff's abdomen was beginning to swell. Later on a tumor developed on the left side pretty well back. About seven weeks after witness first saw plaintiff, there developed an abscess which revealed itself by the discharge into the large gut, the passage of pus and blood and shreds of tissue from the bowels. Witness treated plaintiff during the fall of 1898 and up into 1899, and has seen him at intervals ever since. During the fall of 1898, plaintiff was confined to his bed most of the time, and suffered from a partial paralysis of the bowels and could not get an operation without enemas, that is, the introduction of a tube into the rectum. As to his condition now, witness regards plaintiff as suffering with a chronic pus cavity breaking into the large gut and contraction of the gut and suffering with a partial paralysis of the large bowel, a condition in which he is unable to evacuate his stools without the assistance of artificial means. In the opinion of witness, plaintiff will not get well. The fact of having a poisonous condition of the internal organs has reduced his strength. It has a bad effect upon his nervous and muscular systems and also upon his digestive system. Witness does not think plaintiff is physically able to labor. The recurrent abscesses plaintiff has are painful. The reasonable value of witness's services is something over $300. Plaintiff has reached the stage now where he can use a syringe himself for the purpose of having action."

William J. White, being duly sworn as a witness on the part of plaintiff, testified as follows: Lives in St. Louis and his occupation is that of a carpenter; has lived in St. Louis thirty-two years; has known plaintiff since the 28th day of August, 1898; saw him at his house on that day; he was in bed when witness got there; witness was sent by the local council of the Carpenters and Joiners of America as a delegate from the sick committee; witness saw plaintiff regularly every week for ten weeks; during that time plaintiff was not able to work; after the said ten weeks witness saw plaintiff about once a month; he seemed to be in about the same condition; in August, 1899, witness began calling there every week, and found plaintiff in about the same condition as aforesaid; on all of these occasions the man looked big and stout, but he was weak; on one occasion witness walked a short distance with plaintiff, and plaintiff was panting like a winded horse.

I. Upon the foregoing state of facts, the defendant insists the circuit court should have sustained the demurrer to the evidence offered at the close of plaintiff's case, and again offered at the close of all the evidence.

This contention is based, first, on the proposition that plaintiff's action is based on the theory that plaintiff was an independent contractor, whereas the evidence shows he was simply a servant of the defendant, and having failed to show he was an independent contractor he can not recover on the theory that he was a servant only. Second, that there were only three allegations of negligence in plaintiff's petition, and there was no evidence to support either, hence there was nothing to submit to the jury.

In a word, the defendant insists that the evidence shows as a matter of law that plaintiff was not an independent contractor.

The legal test for the determination of this question is stated by Judge Thompson, in his work on Negligence, vol. 2, p. 899, sec. 22, as follows:

"The general rule is, that one who has contracted with a competent and fit person, exercising an independent employment, to do a piece of work, not in itself unlawful or attended with danger to others, according to the contractor's own methods, and without his being subject to control, except as to the results of his work, will not be answerable for the wrongs of such contractor, his sub-contractor, or his servants, committed in the prosecution of such work. An independent contractor is one who renders service in the course of an occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished."

This statement of the law was specifically approved in Fink v. Mo. Furnace Co., 82 Mo. 276, in which case it was held that the foregoing statement of the law had been recognized and affirmed in Hilsdorf v. St. Louis, 45 Mo. 98; Morgan v. Bowman, 22 Mo. 538; Clark's Admrx. v. Railroad, 36 Mo. 218; Barry v. St. Louis, 17 Mo. 121. Those cases were reaffirmed in Long v. Moon, 107 Mo. 334, and again in Crenshaw v. Ullman, 113 Mo. loc. cit. 639.

In Fink v. Furnace Co., 82 Mo. 276, Stevenson, a negro teamster, hired Jones, another negro, to help him dig and haul sand to the furnace company at 55 cents a load. There was no stipulation as to how he should dig the sand, but the company gave him permission to get the sand from their lot, where in digging Stevenson and Jones left a hole in the bank and plaintiff's child went under the bank, and the superincumbent soil fell on it and killed it. It was held that Stevenson was an independent contractor, and the company not liable for his negligence.

So where the owner employed another to construct an elevator in his building and by the negligence of the

contractor a stick of timber fell and struck a lady in an adjoining yard, it was held the owner was not liable. [Long v. Moon, supra.]

The rule announced by Judge Thompson and approved so often by this court is approved by Shearman and Redfield on Negligence, secs. 164-165; Powell v. Construction Co., 88 Tenn. 692.

But it is not easy always to say that the facts of a given case bring it within the definition of an independent contractor.

Shearman and Redfield on Negligence declare such contractor to be one who undertakes to do specific piece work for other persons without submitting himself to their control in the details of the work save as to *the result* of the work. [S. & R. on Neg., sec. 164, and cases cited.]

The same authors in section 165 declare that one who contracts to do a specific piece of work, furnishing his own assistants and executing the work either entirely according to his own ideas, or in accordance with a plan previously given to him by the person for whom the work is done, without being subject to the orders of the latter in respect to the details of the work, is clearly a contractor and not a servant; and "an express contract to pay by the job is always strong evidence that the relation of master and servant does not exist." Nor does the mere right to inspect and require the work to meet the approval of the employer make the contractor a servant. When the facts are undisputed no doubt exists that the court may declare as a matter of law whether one is an independent contractor or merely a servant, as in Long v. Moon, 107 Mo. 334, but where the facts are disputed the proper course it seems to us must be to leave it to the jury under proper instructions to say whether one was an independent contractor or a servant, accordingly as the facts are found.

Great stress is laid by defendant on the fact that plaintiff testified that Hunter was the foreman in that .

part of the yard, but it was said in Larson v. Railroad, 110 Mo. loc. cit. 241, that "it is now the accepted rule that supervision of work may be retained without interfering with the independent action or liability of contractors who have engaged to perform it or subdivisions of it." So that giving plaintiff's statement in his deposition its full force it imports no more than that defendant reserved the general supervision of its yards and the right to inspect the various pieces of work to see that they conformed to the contract or plans under which they were being constructed.

In defendant's first instruction, which the court refused as offered, the essentials which defendant insists made plaintiff a servant and not a contractor are, that plaintiff agreed to work under the general supervision of defendant's foreman as a carpenter with other carpenters who should compose his gang from time to time; that a stipulated sum should be paid for each car framed and that sum divided equally between the four carpenters who framed it and be paid monthly, and if *defendant could discharge plaintiff or any of his gang if it saw fit to do so,* then plaintiff was an independent contractor.

It is obvious in view of the principles already announced that no one, nor all, of these hypotheses, save and except the right to discharge plaintiff, establish that plaintiff was merely a servant and not an independent contractor. As to the right to discharge plaintiff or any of his gang there was a plain contradiction, Hunter affirming such a right, plaintiff and Hoch, and Aldridge and Hockenbaugh denying that any such right was reserved to Hunter or the defendant. The contract was made with Dalton, the general foreman, and he did not testify that any such right was reserved to defendant. As stated in the instruction this right was absolute.

As said in Blum v. Kansas City, 84 Mo. 116, "certainly the mere reservation of the power to suspend the

work, or annul the contract, did not make the city liable for negligence in the construction of the work." That the defendant might have closed its works without being liable to plaintiff may be conceded, but outside of Hunter's evidence there was no testimony that plaintiff agreed that Hunter or defendant might discharge him or any of his gang. Under these circumstances and in view of this conflict of evidence as to the nature of the employment, the court properly submitted the case on plaintiff's theory as well as defendant's, and had no right to assume either had correctly stated the contract and base a peremptory instruction on either theory. Moreover, defendant did not try the case on such a theory, but by submitting and obtaining its instruction as modified by the court, it conceded this was a proper question for the jury to determine under its instructions whether plaintiff was an independent contractor or not. [Berkson v. Cable Co., 144 Mo. 220.]

The second ground urged why the court should have given an instruction in the nature of a demurrer to the evidence is that there was no allegation of negligence outside of three specifications, in the petition, and as those three were shown to be groundless, it was error to submit the case to the jury. This ignores the averment that "plaintiff was injured as aforesaid by the carelessness and negligence of defendant in causing said transfer car or platform and a railroad car thereon to strike and push said end of said timber projecting over and across the rail of said transfer track as aforesaid."

In suing a defendant for the negligence of its servant it is entirely permissible to allege that the defendant did the acts alleged to be negligent and averring generally that it was negligently and carelessly done. [Mack v. Railroad, 77 Mo. 232; Schneider v. Railroad, 75 Mo. 295.]

Particularly is this true when, as in this case, no

objection to its sufficiency was taken before the trial or on the admission of the evidence.

If the plaintiff was an independent contractor, he was not a servant, and consequently not a fellow-servant, of the men operating the transfer car, and if he was hurt by the negligence of the men on the transfer car in heedlessly running said transfer platform against the timber he was handling, or by the negligence of the defendant or its superintendent in having the men on the car so placed behind the box car that they could not see the projecting timber and furnishing no other watchman to look out for those whose work required them to cross the track with timbers, he was entitled to recover.

This petition is not like the petition in the McManamee case, 135 Mo. 447, in which we held that when a general allegation of negligence is followed by an enumeration of specific acts of negligence the plaintiff will be confined to the negligence specifically charged, for in this case there is a fourth specification, under which the negligent striking of the timber by the car is alleged.

This assignment must be ruled against defendant.

II. The second instruction is challenged because it is insisted there was no evidence upon which to base it. Counsel insist that the evidence discloses that there were two men on the transfer platform and that when one of them was occupied in adjusting the ropes or cables the other was not, and hence there was no negligence in not keeping a watch for those who would necessarily be crossing the pit with timbers in front of the moving platform or transfer car.

The evidence on this point shows that this transfer car was used to move cars from one shed to another in the course of their construction, and it was provided with a railroad track running entirely across its front, on which the cars were taken from one shed and un-

loaded at another. These cars were pulled on or off of the movable transfer platform by a cable which was wrapped around a large cylinder or drum which stood in the center of the transfer platform, and said cable was also wrapped around two smaller cylinders or spools, one at each end of the car. When a car was standing on this platform it was in front of this drum and these spools, and shut off the view of any person standing at the drum or at either of the spools. There were two men at work on the transfer car (at the time of the accident, they were Horst and Whitneber) whose duty it was to attend to taking the cars on and off of the transfer platform, and when they had a car on this transfer, as they had at this time, it was their duty while the transfer was in motion to adjust the cable around the drum and spools so as to be ready to immediately pull the car off of the transfer when it reached the other shed for which it was destined. The evidence very clearly shows that the adjusting of the cable took but a short time unless the cable had become fouled, and this occurred quite frequently.

Horst testified that when the car struck plaintiff's timber he was engaged adjusting the cable. "I don't believe I was through with my rope, then. I catched foul with the rope and somebody hollered." He was not watching at the time but was busy putting his rope around the cylinder and spools and hadn't got through when the transfer struck the timber. It was practically conceded he could not see from the point at which he was working because the box car was in front of him, and he was busy at his rope but the insistence is that Whitneber saw or could have seen plaintiff and his associates on the track. Whitneber was dead at the time of the trial.

Horst in one portion of his testimony says Whitneber had put his rope around his spool before he, Horst, finished adjusting his, but in another part of his evidence he testified he did not know what Whitneber was

doing at the time of the accident. He didn't know what he did that day; that Whitneber worked at the *north* end and witness at the *south* end of the transfer car; that the rope around the drum was fouled. That when anything is wrong with the drum, it interferes with feeding the spools. Plaintiff was working *south* of the transfer, the side on which Horst was working and on which naturally he would watch when not engaged at the spools and Whitneber was at the north end. The pit was fifty feet wide. A freight car stood on the transfer. Whether Whitneber standing on the north end of the transfer car and at the north end of a freight car standing thereon could see the timber on the south side across the track was a question of fact for the jury. While Horst says that at a distance of 250 or 300 feet away, Whitneber could see the timber, plaintiff's witnesses testify that the transfer was 90 or 100 feet away and standing still when they crossed the track with the timber. The transfer was moving, and what point it had reached, when Whitneber finished adjusting his rope, is left in doubt, and with the car obstructing his view to the *south*, the jury might well have found that he could not see the timber in time to give the alarm.

The court left it to the jury in the second instruction to determine "from the evidence whether in the position in which Horst and Whitneber had to stand while disentangling said ropes and adjusting them on said drum and spools, they could see in front of said transfer car when there was a box car standing across the front of the transfer car and that if they were busy at their cables and required to be by defendant, then it was not the negligence of these men which occasioned the injury to plaintiff, but defendant's own negligence in not furnishing watchmen for said transfer." We do not agree with defendant's counsel that there was no evidence from which the jury might have found that neither Horst nor Whitneber could have seen the pro-

jecting timber, situated and engaged as they were at the time.

III.   Instruction numbered 4 for plaintiff was assailed on the ground that it assumes facts not proven or which the jury alone could find.

We think this contention is without merit because the whole question of damages is predicated upon the proposition "that if the jury find for the plaintiff they will assess his damages," etc.   To find for the plaintiff at all they were required to find that he had been struck by the moving car, and injured, and if so, then they would "assess his damages in such sum as the jury *believe from the evidence* will compensate for all pain, suffering to body and mind *caused plaintiff* as the direct result of the injury sustained by plaintiff," etc. This was not an assumption of anything.   They must first find his injury and then compensate him for it. Neither was there any assumption as to medical attendance.   But an answer to all this is that there was in fact no dispute as to his injuries or his medical attendance.   The witnesses testified fully as to his injury, his pain and the character of the medical attention.   It is not error to assume a fact over which there is no controversy.   [Taylor v. Iron Co., 133 Mo. 366; Pope v. Cable Co., 99 Mo. 406.]

IV.   In various other instructions the defendant prayed the court to instruct the jury that if plaintiff was injured by the negligence of Horst and Whitneber or either of them, the plaintiff could not recover because they were his fellow-servants.

The court modified these instructions, by adding thereto the proviso that they found they were fellow servants.   Of this modification the defendant has no cause for complaint.   As already said there was evidence which justified the jury under the instructions of the court in finding plaintiff was an independent contractor and this being so it was obviously improper for

the court to tell the jury by a peremptory instruction they must find for defendant because plaintiff was injured by the negligence of a fellow-servant.

As to the alleged error in refusing the sixth instruction, it suffices to say that the court modified it by merely adding to it the words "and thereby caused or directly or indirectly contributed to plaintiff's injury," so that as given it read:

"The court instructs the jury that if you believe from the evidence that plaintiff and his gang were negligent in leaving the timber sticking out of the shed and over the tracks of the transfer table, and thereby caused, or directly contributed to plaintiff's injury, then the plaintiff can not recover."

As modified it was clearly a proper instruction on contributory negligence. Moreover the court gave instruction numbered 7 asked by defendant in these words:

"7. The court instructs the jury that if you believe from the evidence that the plaintiff himself was guilty of negligence which directly contributed to cause his injury, the plaintiff can not recover."

Plaintiff's contributory negligence, if any, was fairly and fully submitted to the jury.

V. Again error is alleged in permitting the witness Otto Muechsler to answer a question in these words: "I will ask you to state whether or not you saw what those men were doing while on the transfer table?"

Counsel for defendant: "We object to that as irrelevant and incompetent." Obviously this was no objection at all. The witness then answered: "I saw them taking and shoving their cables over the spools getting ready to pull a car off the transfer into the shed down the line where it was supposed to go while the transfer table was in motion." But outside of the insufficiency of the exception, it is plain the evidence

was pertinent and competent to show the course of business and the duties exacted of the men on the transfer. The witness had worked in these sheds from September, 1897, to February, 1898, and had seen Horst and Whitneber operating the transfer and this injury occurred about four months later. There was no suggestion or proof that a different method had been adopted since he saw them. It was not so remote, even if that objection had been made, as to render it wholly inadmissible.

But it was merely cumulative. Horst and Hunter both testified to the same thing and it doubtless had but little effect on the jury.

But the objection was too indefinite to avail in this court. [State v. Wright, 134 Mo. 418; Lumber Co. v. Rogers, 145 Mo. 445.]

This cause has been twice tried and resulted each time in a verdict for plaintiff. The issues were submitted on fair instructions on both sides.

The defendant by its own instructions submitted the questions which it now says ought not to have been left to the jury. A party can not thus play fast and loose. It is bound by the line of conduct it adopted on the trial.

We find no reversible error and the judgment is affirmed.

All concur.